the judgments of forfeiture on the ground that it came too late.

The court took no action on the motion to strike out, but, after hearing the evidence, overruled the motion, and signed judgments against the accused and his sureties on the bail bonds. The defendants have appealed.

The evidence taken on the trial of the motion showed that the judge was absent from the parish of Red River, and at the request of counsel for the accused telephoned the sheriff of said parish to take the bail bonds in question. In other words, the bonds were executed under a verbal order, fixing the amount of bail, and directing the sheriff to take and approve them.

Act No. 17 of 1900, relative to the forfeiture of bonds in criminal cases, after providing for the entry of a judgment of forfeiture, on the nonappearance of the accused, proceeds as follows:

"The judgment of forfeiture may at any time within five days after rendition thereof be set aside upon the appearance and trial and conviction or acquittal of (the accused) or upon a continuance, after such appearance granted upon motion of the attorney representing the state."

The accused made no appearance within the five days, and therefore the judgment of forfeiture became absolute. State v. Adair, 115 La. 770, 40 South. 41; State v. Bertrand, 123 La. 575, 49 South. 199.

The other questions raised by the pleadings need not be considered.

Judgment affirmed.

---

(58 South. 870.)

No. 19,346.

STATE v. FERRANDAU.

(June 4, 1912.)

*(Syllabus by the Court.)*

COMMERCE (§ 54*)—SUBJECTS OF REGULATION —INTERSTATE SHIPMENTS.

The provision contained in section 1 of Act No. 189 of 1910, to the effect that "no person, firm or corporation shall ship oysters out of this state for canning or packing out of this state," is a discriminatory regulation of interstate commerce, inasmuch as, by other provisions of the statute, any one engaged in the business may ship oysters in unlimited quantities, for any other purpose, and may can or pack them in unlimited quantities, within the state, and it is only the person who ships them out of the state, to be packed or canned out of the state, to whom the prohibition applies.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 71, 100, 106, 108, 111, 134; Dec. Dig. § 54.*]

Provosty, J., dissenting.

Appeal from Criminal District Court, Parish of Orleans; Frank D. Chretien, Judge.

L. J. Ferrandau was convicted of shipping oysters out of the state for the purpose of canning and packing them out of the state, and appeals. Reversed, and prisoner discharged.

Adams & Generelly, for appellant. St. Clair Adams, Dist. Atty. (Amos L. Ponder, of counsel), for the State.

MONROE, J. Defendant was charged, under section 1, of Act No. 189 of 1910, with knowingly shipping "10 barrels of oysters out of the state of Louisiana to the city of Biloxi, in the state of Mississippi, for the purpose of canning and packing said oysters, out of the state of Louisiana." He demurred, on the ground:

"That so much of section 1, of Act No. 189 of 1910, as prohibits the shipment of oysters out of the state for canning and packing out of this state, is unconstitutional, null, and void, being violative of the third subdivision of section 8 of article 1 of the Constitution of the United States."

The demurrer having been overruled, defendant took his bill of exceptions, and was thereafter convicted, upon an agreed statement of facts, and duly sentenced to fine and imprisonment, from which he has appealed.

The statement of facts reads as follows:

"It is admitted that the oysters were grown in private beds in the state of Louisiana and shipped to the firm of Pecola & Michel, wholesale oyster dealers in New Orleans; that L. J. Ferrandau purchased the ten barrels of

oysters, in the shell, in the open market in New Orleans, from Picola & Michel, and shipped the said oysters, in the shell, by rail, to the Barataria Canning Company at Biloxi, Miss., knowing that said oysters were going to be used by said canning factory, in the state of Mississippi, for the purpose of canning and packing said oysters, out of the state of Louisiana; that said transportation did occur, as alleged in the information, on the 16th day of January, 1912."

Section 1 of Act No. 189 of 1910 reads:

"That all beds and bottoms of rivers, bayous, lagoons, lakes, bays, sounds and inlets, bordering on, or connecting with, the Gulf of Mexico, and that part of the Gulf of Mexico within the jurisdiction of the state of Louisiana, including all natural oyster reefs and oysters and other shell fish growing thereon shall be construed and remain the property of the state of Louisiana, except as otherwise provided, and shall be under the exclusive control of the board of commissioners for the protection of birds, game and fish. The board may permit the use of said bottoms and reefs for the purpose of fishing, taking, bedding and raising oysters and other shell fish, subject to the restrictions imposed by law and the regulations of said board in so far as they do not conflict with the laws of the state. No grant, sale or conveyance of the lands forming the bottoms of said bodies or streams of water shall, hereafter, be made by the Register of the State Land Office, by any other official, or by any subordinate political corporation. Persons, firms, or corporations domiciled in this state, with their factories, shucking plants and shipping depots, located therein, may enjoy the right of fishing oysters from the natural reefs and leased bedding grounds whenever they have complied with the rules and regulations of said board; provided such oysters be canned and shucked or packed in this state, or shipped raw, in shells, from a shipping depot in this state, but no person, firm, or corporation shall ship oysters out of this state for canning or packing out of this state."

It will thus be seen that the law contemplates that the oyster shall be a commodity of commerce, and specifically provides that they may be packed and canned, and shipped in that condition or raw, in the shells, from a shipping port, in this state, and that they may be, and as the admitted facts in this case show are, lawfully sold and bought, in the open market, by any one who may choose to engage in the traffic, and hence may be bought by citizens of other states. The contention, however, seems to be that it is competent for the state of Louisiana to attach to the shipments, thus specifically authorized, the condition that they shall not be made with a view to the canning or packing of the oysters "out of this state."

In other words, a citizen of Louisiana who buys, in open market in this state, oysters "grown in private beds" or elsewhere, which are lawfully sold, may take them to his home and there sell, consume, pack, or can, and (either before or after they are packed or canned) ship them to another state; but the citizen of another state, who also buys such oysters in the open market, is prohibited from taking, or shipping, them to his home, if his intention is there to pack or can them. So that the state, having made the oyster a commodity of interstate commerce, assumes to regulate and control such commerce, as those who engage in it may be actuated by one purpose or another; saying to the one shipper, "As your purpose is that your buyers and consignees, living out of the state, shall sell or consume the oysters which you sell and ship to them, your trade is lawful"; and to the other, "As your purpose is that your buyers and consignees, or that you, yourself, shall pack or can, out of the state, the oysters shipped by you, your trade is unlawful"; and saying to all, "The oysters produced in Louisiana, whether in private beds, or elsewhere, may be packed and canned, but whilst such packing and canning is lawful if done within the state, their shipment, for the purpose of packing or canning them, out of the state, is unlawful."

The learned judge of the district court, in giving his reasons for overruling the demurrer, says:

"It is evident to me that, if the state has the right to prohibit the exportation from the state of oysters taken from the oyster beds of this state, it has the right to permit the exportation of those oysters subject to such conditions and limitations as it may deem proper to impose."

It will be conceded that, when Louisiana was admitted into the Union, she became the owner, by virtue of her sovereignty, of all the tidewater bottoms and the beds of the navigable streams within her territorial jurisdiction, including all the shell and floating fish to be found upon those bottoms or in the waters above them; the property to be held in trust for the benefit of the whole people. It must also be conceded, however, that lands below high-water mark may be granted to individuals for particular uses (Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331, and cases there cited), just as the state of Louisiana is now leasing such lands for the production of oysters. The learned judge a quo seems, however, to have proceeded upon the theory that the oysters which defendant is charged with having shipped were grown upon "the oyster beds of the state"—a theory which is hardly reconcilable with the admission "that the oysters were grown in private beds." The opinion quoted continues:

"It" (the state) "may say that only a certain number of oysters shall be shipped, and it may say, as it does in this case, that the oysters can be shipped out of the state for all purposes, except when shipped to be canned out of the state. The reason for this is obvious. If unlimited exportation or shipments of oysters were permitted, for the purpose of being canned in other states of the Union, the oyster beds of this state would soon be depleted, and one of the most useful and valuable commodities of the state would be destroyed; besides, the prohibition against the shipment of oysters for canning purposes in other states tends to increase the valuable assets of this state by forcing canning factories to be established in this state, and thus add to the revenues of the state and to the support and well-being of the people of the state. * * * The interstate commerce in oysters, shipped from this state, commences only from the time that the oysters are loaded on the transportation line and start on their journey to other states of the Union; until that time, they remain the separate and exclusive property, and are within the power of regulation, of the state of Louisiana. The penalty attached to the shipment of oysters into other states is not directed against the carriers, but is directed, exclusively, against the persons from this state, shipping the oysters. It therefore in no way interferes with the rights of the carriers, and it imposes no additional obligations upon them and upon commerce between the states."

Conceding (arguendo) that the state may prohibit, altogether, the shipment of oysters beyond her borders, whether "grown in private beds" or elsewhere, she has not done so. To the contrary, any one may ship all that he chooses, provided, only, that those which have not already been so dealt with shall not be shipped for packing and canning, out of the state, whilst those who pack and can them, within the state, may ship all that they choose in that form and for any purpose. It is not a question, therefore, of the number or quantity that may be shipped, but a question of forcing all those who are engaged in the oyster trade to pack and can, or to have packed and canned, all the oysters, produced in Louisiana, which they propose to sell in that form, packed and canned in Louisiana packeries and canneries, in order, as our learned Brother says, "to increase the valuable assets of the state * * * and thus add to the revenues of the state."

There can be no question, as it appears to us, that this is to impose a regulation upon interstate commerce (those who buy and sell and ship being engaged in that business, as well as the carriers, who merely transport their goods), for it is to lay an embargo upon the trader who may wish to ship a limited number of oysters, to be packed and canned elsewhere, whilst permitting another to ship an unlimited number, which have been packed or canned within the state, for any other purpose whatever. The only remaining question is whether such regulation is permissible, as incidental to the object which it is designed to accomplish. And that question, we think, must be answered in the negative.

The states, for the enforcement of their quarantine and inspection laws, the right to enforce which is reserved to them by the Constitution, may impose conditions which

operate as regulations of interstate and foreign commerce; and so, in the legitimate exercise of their police power, which is a term of wide significance; but we know of no instance in which it has been held that a state may regulate such commerce merely that its revenues may be increased.

The right of a state to prohibit the possession, during a closed season, within its borders, of game birds, taken in other jurisdictions, was a question upon which the courts differed, until it was finally settled by an act of Congress authorizing the exercise of such power. People ex rel. Hill v. Hesterberg, 184 N. Y. 126, 76 N. E. 1032, 3 L. R. A. (N. S.) 163, 128 Am. St. Rep. 528, 6 Ann. Cas. 353. The right of a state to prohibit, during an open season, the exportation of such birds, killed within its borders, was decided in the affirmative in Geer v. State of Connecticut, 161 U. S. 519, 16 Sup. Ct. 600, 40 L. Ed. 793, and it was there held that:

"Although the killing of game and its sale within the state are allowed, it does not thereby necessarily become the subject of interstate commerce in the legal meaning of those words."

The prohibition was, however, general, and the court, additionally, held that:

"The police power of the state to preserve game birds, as a valuable food supply for its people, justifies a statute prohibiting the transportation of such birds beyond the state, even if interstate commerce may be remotely affected."

Here, the apparent purpose is not to preserve a valuable food supply, but to secure to those so engaged, in this state, a monopoly of the business of packing and canning Louisiana oysters, and thereby increasing the assessable property and revenues of the state.

In McCready v. Virginia, 94 U. S. 391, 24 L. Ed. 248, Waite, C. J., said:

"The precise question to be determined in this case is whether the state of Virginia can prohibit the citizens of other states from planting oysters in Ware river, a stream in that state where the tide ebbs and flows, when its own citizens have that privilege. * * * There is here no question of transportation or exchange of commodities, but only of cultivation and production."

In Turner v. State of Maryland, 107 U. S. 38, 2 Sup. Ct. 44, 27 L. Ed. 370, a statute of the state of Maryland, providing for the packing and inspection, or marking without inspection, of tobacco, grown in that state, was held not to be in contravention of the commerce clause of the Constitution of the United States; but the statute was general in its application and did not undertake to regulate shipments of tobacco with regard to the purpose of the shipper or consignee.

On the other hand, in Robbins v. Taxing District, 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694, it was held that (quoting from the syllabus):

"The negotiation of sales of goods which are in another state, for the purpose of introducing them into the state in which the negotiation is made, is interstate commerce."

The negotiation, therefore, in Mississippi, of the sale of oysters, which are in Louisiana (and being lawfully sold there in open market), for the purpose of introducing them into Mississippi, is interstate commerce, and a condition, imposed by the law of Louisiana, that one buyer, in Mississippi, shall have his oysters shipped to him provided he intends to make this use of them, and another buyer may have his shipped, provided he intends to make that use, is a regulation of that commerce, within the law, as we understand it, vesting such power of regulation in Congress; nor do we think that, as applied to this case, it affects the discriminating character of the regulation, that the oysters were bought in New Orleans, by defendant, and shipped by him to the canning company, in Biloxi, for which he purchased, or to which he sold, them.

In Brimmer v. Rebman, 138 U. S. 78, 11 Sup. Ct. 213, 34 L. Ed. 862, it was held that:

"A state cannot, under the guise of exerting its police powers, or of enacting inspection laws, make discriminations against the products and industries of its own or of other states."

Nor can a state, with reference to person engaged in interstate commerce, make discriminations in favor of those who patronize its industries and those who patronize the industries of other states.

We are therefore of opinion that the demurrer should have been sustained, and, it is, accordingly, ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed; that the demurrer filed by defendant be sustained; and that he be discharged without day.

PROVOSTY, J. I dissent.