The NEW MEXICO STATE GAME COM-
MISSION, Plaintiff-Appellee,

v.

Stewart L. UDALL, Secretary of the In-
terior, et al., Defendants-Appellants.

No. 58-68.

United States Court of Appeals
Tenth Circuit.

May 15, 1969.

Rehearing Denied June 13, 1969.

Jacques B. Gelin, Dept. of Justice, Washington, D. C. (Clyde O. Martz, Asst. U. S. Atty. Gen., John F. Quinn, Jr., U. S. Atty., Michael P. Watkins, Asst. U. S. Atty., Albuquerque, N. M., S. Billingsley Hill, Dept. of Justice, Washington, D. C., with him on the brief), for defendants-appellants.

George T. Harris, Jr., Sp. Asst. Atty. Gen., Albuquerque, N. M. (James A. Maloney, Atty. Gen., and Boston E. Witt, former Atty. Gen., Santa Fe, N. M., Peter J. Broullire, III, Sp. Asst. Atty. Gen., Albuquerque, N. M., with him on the brief), for plaintiff-appellee.

Paul A. Lenzini, Washington, D. C., for International Assn. of Game, Fish and Conservation Comrs., amicus curiae.

Joseph Clifford, Asst. Atty. Gen., Phoenix, Ariz. (Gary K. Nelson, Atty. Gen., adopting the brief of The New Mexico State Game Commission, plaintiff-appellee herein), for State of Arizona, amicus curiae.

Ford Scalley, Salt Lake City, Utah (Phil L. Hansen, Atty. Gen., Kenneth M. Hisatake, Sp. Asst. Atty. Gen., Salt Lake City, Utah, on the brief), for State of Utah, amicus curiae.

Elmer P. Cogburn, Denver, Colo., for National Wildlife Federation.

Duke W. Dunbar, Atty. Gen., Gerald W. Wischmeyer, Asst. Atty. Gen., Denver, Colo., for Colorado Game, Fish, and Parks Division.

T. J. Jones, III, Boise, Idaho, Special Counsel for Idaho Fish and Game Dept.

Robert C. Londerholm, Atty. Gen., filed motion to adhere to the brief of The New Mexico State Game Commission, plaintiff-appellee herein, for Kansas Forestry, Fish and Game Commission.

Frank J. Kelley, Atty. Gen., Robert A. Derengoski, Sol. Gen., Nicholas V. Olds and Esther E. Newton, Asst. Attys. Gen., Lansing, Mich., for State of Michigan.

Forrest H. Anderson, Atty. Gen., Chadwick H. Smith, Asst. Atty. Gen., Helena, Mont., for Montana State Fish and Game Commission.

Clarence A. H. Meyer, Atty. Gen., Calvin E. Robinson, Asst. Atty. Gen., Lincoln, Neb., for Nebraska Game and Parks Commission.

Robert Y. Thornton, Atty. Gen., Salem, Or., Roy C. Atchinson, Asst. Atty. Gen., Portland, Or., for State of Oregon.

John J. O'Connell, Atty. Gen., Mike Johnston, Asst. Atty. Gen., Olympia, Wash., for Washington Dept. of Game.

Before PICKETT, LEWIS and HILL, Circuit Judges.

PICKETT, Circuit Judge.

The New Mexico State Game Commission brought this action seeking a judgment declaring that the Secretary of Interior and his subordinates did not have authority to kill deer within the boundaries of Carlsbad Caverns National Park in New Mexico for research purposes, without obtaining state permits required by New Mexico Statutes. The Commission also sought an injunction prohibiting further killing of deer without the state permit. The complaint alleged that under the law of New Mexico the Commission controls, regulates and manages the hunting of deer and other wildlife on all lands within the State of New Mexico; that the defendants were charged by federal law with the responsibility of managing and controlling lands in New Mexico known as "Carlsbad Caverns National Park"; that the Commission was advised by the Park Superintendent that a "Deer Range Ecology Study" was to be undertaken which required the killing of not more than 50 deer within the park boundaries;[1] that some deer had been killed in violation of state law and the "announced scheme of killing fifty (50) deer" would be continued unless restrained. Attached to the complaint as exhibits was correspondence between the Park Superintendent and the Commission's Chief of Game Management.

Prior to the commencement of the action, a representative of the Commission

---

1. The method of obtaining the deer desired for the study was described in a letter from the Park Superintendent to an appropriate representative of the Commission, as follows:

"In connection with an in-depth research project entitled "Deer-Range Ecology Study" the collection of deer paunches has been authorized. Research Biologist Walter H. Kittams and his assistant will be examining paunches and determining condition of deer obtained within the boundaries of the park by members of our uniformed staff. It is also possible that paunches from hunter-killed deer near the park boundary will be utilized if conditions warrant. At the present time we are stipulating that no more than 50 deer will be taken in the park in a 2-year period."

was furnished with a statement of the objectives of the study and procedures to be followed. The value of the study to the State's overall management of one of its deer herds was acknowledged. Objection to the program arose only when the park officials refused to apply for state permits which had been offered. The trial court denied a motion to dismiss, holding that the action was not an unconsented suit against the United States. The case was disposed of on stipulated facts without a trial, and the court concluded that the aforesaid deer-killing program was not within the statutory authority of the Secretary of Interior or his subordinates, and enjoined further killing of the deer without a state permit. 281 F.Supp. 627. The district court recognized the "Government's authority to protect its lands" within the park boundaries, but held that the deer-killing program could be undertaken only after a showing or a finding that there was existing depredation cause by the deer. We are of the opinion that this narrow construction of the statute is unwarranted and hold that the research program to obtain reliable scientific information necessary to conserve the scenery and wildlife in the park was within the Secretary's statutory authority, and hence the case is an unconsented suit against the United States.

There is no dispute between the parties as to the general applicable law. As we stated in Harper v. Jones, 195 F. 2d 705, *cert. denied,* 344 U.S. 821, 73 S. Ct. 19, 97 L.Ed. 639:

> "(W)here a federal officer acts within the limits of his legal power and authority and exercises a function

legally delegated to him, an action to restrain him cannot be maintained without impleading the sovereign even though there is a claim of error in the exercise of that power or an abuse of discretion."

See also Larson v. Domestic and Foreign Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L. Ed. 1628; Ogden River Water Users Ass'n. v. Weber Basin Water Conservancy, 10 Cir., 238 F.2d 936; New Mexico v. Backer, 10 Cir., 199 F.2d 426; Frost v. Garrison, D.C.Wyo., 201 F.Supp. 389. These decisions, as well as a myriad of others, recognize that if a federal officer or employee acts beyond the power conferred upon him by Congress, the Immunity Rule has no application. The Court in *Larson* quoted with approval this language from Philadelphia Co. v. Stimson, 223 U.S. 605, 620, 32 S.Ct. 340, 56 L.Ed. 570:

> "(I)n case of an injury threatened by his illegal action, the officer cannot claim immunity from injunctive process. The principle has frequently been applied with respect to state officers seeking to enforce unconstitutional enactments. (Citing cases). And it is equally applicable to a Federal officer acting in excess of his authority or under authority not validly conferred." 337 U.S. 690–691, 69 S. Ct. 1462.

The basic question, then, as presented here, is whether the supervisory powers granted to the Secretary of Interior over the management of national parks authorize the killing of deer within Carlsbad Caverns National Park for an ecology study to determine deer range conditions within that park.[2]

---

2. The conditions which determined the necessity of the study were stated in a recommendation of a department biologist, which states:

"Mule deer occur throughout the park and are the major consumers of browse, but the park lacks adequate data for a deer management plan. Deer have caused deterioration of choice browse plants on most of the park. Their effect on other vegetation, which likely

comprises the bulk of the deer diet on most range sites, is unknown. Major fluctuations in deer numbers have apparently occurred over the years, but their relation to available forage and other factors has never been documented. Predation and nearby hunter harvest probably exert only minor control, and deer numbers build to the limit of the forage resource. To avoid serious deterioration of habitat, and damage to

**1200**

■■ The Secretary does not assert that the United States has any ownership in wild animals within the various states. Court decisions indicate that, insofar as wild animals within a state are capable of ownership, they are owned by the state in its sovereign capacity for the benefit of its people, with the resulting right to regulate the taking thereof. See Lacoste v. Dept. of Conservation, 263 U.S. 545, 44 S.Ct. 186, 68 L.Ed. 437; Geer v. Connecticut, 161 U.S. 519; 3 C. J.S. Animals §§ 4 and 5 where the decisions are collected. It is conceded that the Secretary has the authority to destroy animals to protect national park property.

In Hunt v. United States, 278 U.S. 96, 49 S.Ct. 38, 73 L.Ed. 200, the power of the Secretary of Agriculture to direct the destruction of large numbers of deer when such action was necessary to protect the lands of the United States from serious injury was upheld under a statutory provision authorizing the Secretary of Interior to "make provisions for the protection against destruction by fire and depredations upon the public forests and forest reservations which may have been set aside or which may be hereafter set aside * * *." 30 Stat. 31, 35.[3] Referring to the action taken by the Secretary, the Court said:

"The direction given by the Secretary of Agriculture was within the authority conferred upon him by act of Congress. And the power of the United States to thus protect its lands and property does not admit of doubt, (citing cases), the game laws or any other statute of the state to the contrary notwithstanding." Hunt v. United States, *supra*, at 100, 49 S.Ct. at 38.

■ The State Commission and the amicus curiae, accepting the conclusion of the trial court,[4] here argue that the *Hunt* decision is limited to authorizing destruction of deer to prevent depredation on public lands known to be occurring. The essence of the argument is that the statute authorizes the killing of wild animals only upon a finding that there exists a present depredation of the park property by the animals to be killed. It is true that the statute herein referred to does not in so many words provide that animals within a park may be killed for research purposes,[5] but the act creating Carlsbad Caverns National Park provides that its "administration, protection and development * * * shall be exercised under the direction of the Secretary of Interior by the National Park Service, subject to the provisions of sections 1 and 2–4 of this title." 16 U.S.C. 407a. 16 U.S.C. § 1 creates the National Park Service and provides that it shall be under the charge of a director appointed by the Secretary of Interior. Clearly the Secretary has broad statutory authority to promote and regulate the national parks to conserve the scenery and wildlife therein "in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U. S.C. § 1. Anything detrimental to this purpose is detrimental to the park. In addition to this broad authority, the

associated wildlife, the park must have basic information on deer-range relationships, and a system for routinely determining trend of the deer population and habitat."

3. The foregoing power was later extended to the Secretary of Agriculture at 33 Stat. 628 (now 16 U.S.C. § 472). See United States v. Hunt, D.C.Ariz., 19 F.2d 634.

4. In the trial court's opinion it is stated: "Section 3 of Title 16 is clearly inapplicable in the present situation. No

showing has been made that the deer involved are detrimental to the use of the park, and indeed, defendants make no such claim. It is the opinion of the Court that the Secretary's authority under this section must be predicated upon such a finding." 281 F.Supp. 627, at 631.

5. The statute under consideration in the *Hunt* case made no reference to the destruction of any wild animals on United States Forest lands.

Secretary is specifically authorized "in his discretion" to destroy such animals "as may be detrimental" to the use of any park. 16 U.S.C. § 3. The obvious purpose of this language is to require the Secretary to determine when it is necessary to destroy animals which, for any reason, *may be detrimental* to the use of the park. He need not wait until the damage through overbrowsing has taken its toll on the park plant life and deer herd before taking preventive action no less than he would be required to delay the destruction of a vicious animal until after an attack upon a person. In the management of the deer population within a national park the Secretary can make reasonable investigations and studies to ascertain the number which the area will support without detriment to the general use of the park. He may use reasonable methods to obtain the desired information to the end that damage to the park lands and the wildlife thereon may be averted.

The affidavit of the Director of the National Park Service describes the purpose of the research program and contains this statement:

"That the Dry Season Food Habits of Deer and Deer-Range Relationship research programs which are attached as Exhibits A and B contemplate the killing within the boundaries of Carlsbad Caverns National Park of approximately 50 deer by National Park Service employees. These research programs are absolutely necessary for the proper management and administration of Carlsbad Caverns National Park in order to fulfill the responsibilities and obligations of the Secretary of the Interior and his delegated agents to conserve the scenery, natural and historic objects, and wildlife of the park; and that this research project is required in order that reliable scientific information may be gathered and used as a basis for other decisions affecting the management and administration of the area for the purpose of preserving and protecting the park lands from injury or damage."

The Commission's Chief of Game Management acknowledged the value of the study to the State's overall management of the deer herd within the area. Under these conditions the Secretary has statutory power to proceed with the ecology study, which requires the killing of some deer within the park boundaries, without interference from state authorities. In protecting the park property it is immaterial that the United States does not have exclusive jurisdiction over the lands within Carlsbad Caverns National Park. Nor are there any constitutional barriers to the procedure. Hunt v. Arizona, *supra*. The relief sought is in effect against the United States.

The action was not the result of the program itself, but was caused by a fear that the deliberate refusal to apply for the deer-killing permits was in furtherance of a "scheme" of the federal authorities to eventually take over the control and management of the wildlife on all federal lands.[6] This concern is un-

6. Typical of this position is the statement in the brief of amicus curiae International Association of Game, Fish and Conservation Commissioners:
"The basic question before this Court is whether federal officers may kill deer on (sic) a national park, in violation of state law, for purposes of scientific research. Although appellants seek to justify such action on grounds that it is necessary to protect park lands, this occurrence is but one in a series of recent endeavors by the Department of the Interior to enter the field of game management, a role which has been historically and competently fulfilled by the States. Therein resides the interest of the Association in this proceeding. Interior Department administrators increasingly claim that, on federally owned lands, the federal government has the right to manage and control wildlife, including the right to take and dispose of such game as the Department deems appropriate, and the State may not interfere. The Association takes strong

derstandable, particularly in public land states where a large percentage of the lands is owned by the United States, and upon which, in some instances, most of the state's game is found. If this threat is real, so far as the statutory power to manage the national parks is concerned, the remedy, we think, is not in the courts if there is no abuse of the discretion granted.

Reversed and remanded with instructions to dissolve the injunction and dismiss the action.

issue with this position and believes that it should not be allowed to pass without challenge."

In the amicus curiae brief filed by the State of Michigan it is said:

"If the Federal Government succeeds in this case in achieving its ultimate aim, as indicated in its brief, of secur-ing complete control over fish and wild-life located on its lands on the theory of its ownership of such lands, it is the fear of the states that the next logical step will be to use this new power for the purpose of regulating hunting and fishing on these lands and charging a license for such a privilege."